**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 25-231-JKB** |
| | **:** | |
| **RON WARDLOW** | **:** | |

---

## MOTION TO SUPPRESS STATEMENTS

Ron Wardlow moves pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure to suppress any and all statements, admissions, and confessions he gave that the government proposes to use as evidence at trial. Mr. Wardlow challenges his statements on two grounds. *First*, he seeks suppression of statements he made prior to being *Mirandized* over two hours after his arrest. *Second*, he seeks suppression of all of statements he made after he was *Mirandized* as his statements were not voluntary and his waiver of his rights was not voluntary, knowing, or intelligent.

## FACTUAL BACKGROUND

Mr. Wardlow is accused of possessing and brandishing a firearm while carjacking an SUV at a Citgo gas station on Eastern Avenue, in Baltimore City, around 1:00 a.m. on February 27, 2025. Following the alleged carjacking, the complaining witnesses called 911, leading to a search by the complaining witnesses and police for the SUV. At roughly 2:15 a.m., the SUV was located at a BP gas station on Gwynn Falls Parkway. A man – later identified as Mr. Wardlow – was observed by helicopter parking the car at a gas pump and walking up to the gas station teller. Around the same time, multiple law enforcement cars boxed in the SUV and attempted to stop Mr. Wardlow.

Mr. Wardlow ran from police, eventually hiding in the cellar stairway of a nearby home.

Surrounded by four police officers with guns drawn and shouting demands, Mr. Wardlow, while smoking a joint, followed their commands and emerged from the cellar stairway. The officers immediately put hands on him, surrounded and tackled him to the ground, handcuffed him behind his back, stated "he's in custody," and lifted him to his feet to search his person. After securing his person, an officer grabbed Mr. Wardlow's hair as he and another officer escorted him to the alleyway behind a row of homes. A few minutes later, Mr. Wardlow was escorted by police as they walked him back to the BP gas station in handcuffs. During this time, Mr. Wardlow was questioned and made statements to police, but he was never read his *Miranda* warnings.

Mr. Wardlow remained on scene at the BP gas station until he was transported to the police station at 3:01 a.m. He was placed in an interview room, where he was audio and video recorded beginning at 3:39 a.m. As seen below, Mr. Wardlow immediately began sleeping, leaning over to his side or to the front:

 

Mr. Wardlow continued to sleep even after the interviewer, Detective Anderson, walked into the room at 4:13 a.m., as shown in the picture below:



Upon entering the room, Detective Anderson and Mr. Wardlow had the following

exchange:

Detective Anderson: Hey, Ron. How are you doing? *Doing all right?*

Mr. Wardlow: Yeah.

Detective Anderson: I'm Detective Anderson with the city police department. *Do you have any idea what day it is?*

Mr. Wardlow: *[Shakes head, indicating no.]*

Detective Anderson: No? Do you have any idea why you are here?

Mr. Wardlow: No.

Detective Anderson: Alright . . . . You're here today in reference to an incident where a car was taken. Do you understand that?

Mr. Wardlow: Yes.

Detective Anderson: Do you want to talk about that?

Mr. Wardlow: *[Shakes head, indicating no.]*

Detective Anderson: No? You don't want to tell your side of the story about what happened?

Mr. Wardlow: I didn't take no car.

Detective Anderson: Ok well, this is your time to get in front of it. Alright . . . . The officers saw you with the car. You ran from the car. You hid and they found you. So, I mean, if you want to sit here and tell me I-I don't know anything about it, I don't know anything about it, there is video from when you took the car and there is video of you being with the car at the gas station getting gas. And then the police pull up and you run away. So I mean, this is, this is the best opportunity for you to tell us what happened. Your side of the story. You know, you're just trying to get home, you didn't mean to hurt anybody, whatever. . . . You know.

Mr. Wardlow: I was just trying to get home.

Detective Anderson: Before we get started with all that, I got to go over your advice of rights.

Before advising Mr. Wardlow of his *Miranda* rights, Detective Anderson searched Mr. Wardlow so as to remove his handcuffs and allow him to sign a waiver form. During this process, Detective Anderson had Mr. Wardlow stand to remove items from his pocket and then his handcuffs. During this encounter, Mr. Wardlow was speaking in a low voice and mumbling, incomprehensible at times. In relevant part, the following exchange occurred:

Detective Anderson: How much cash do you have on you? Do you know?

Mr. Wardlow: No. It was all over the place.

Detective Anderson: When you say it was all over the place, what do you mean?

Mr. Wardlow: I don't know anymore. I don't know. They had some right here. Some right there. I don't know.

Detective Anderson continued, gathering money from Mr. Wardlow's pocket. After Detective Anderson gathered all the money, he allowed Mr. Wardlow to sit down and then turned to counting the money in front of Mr. Wardlow. A picture of Mr. Wardlow dozing off during this portion of the interview appears below.

4



Mr. Wardlow's dozing prompted Detective Anderson, in the middle of counting the money, to say, "I need you to hang in there with me. Alright buddy?" After he was finished taking pictures of the money he had counted, Detective Anderson again asked, "Alright, are you with me?"

Detective Anderson then resumed asking Mr. Wardlow questions. Likely because he was concerned about Mr. Wardlow's presentation, Detective Anderson asked who the President was, a question Mr. Wardlow answered correctly. Detective Anderson then asked whether Mr. Wardlow was under the influence of any drugs or alcohol. Mr. Wardlow responded yes. When Detective Anderson asked what he was under the influence of, Mr. Wardlow stared blankly ahead for approximately five seconds and changed his mind. Still clearly concerned, Detective Anderson followed up in a leading manner, "You're not under the influence of anything? Okay. Alright. So, like I said, you're aware today or Donald Trump's the president." He then asked a simple question, "Uhhh do you know what what day it is today?" When Mr. Wardlow responded, "No, I don't know," Detective Anderson switched to two even easier questions: the month and year. Mr. Wardlow got those correct.

Apparently satisfied with those easy answers, Detective Anderson turned to the *Miranda* advisement. Detective Anderson asked whether Mr. Wardlow wanted to have them read to him or whether he could read them himself. Not surprisingly, Mr. Wardlow asked Detective Anderson to read them. Detective Anderson then read them aloud, heavily directing Mr. Wardlow and pointing to where Mr. Wardlow needed to sign on the waiver form. After telling Mr. Wardlow his third right – that he had the right to talk to an attorney before any questioning or during any questioning – Detective Anderson had to wake Mr. Wardlow by saying loudly, "Ron!" after he failed to respond to "Do you understand that?" Startled, because he had dozed off while Detective Anderson spoke, Mr. Wardlow dropped his pen. After waking him up, Detective Anderson did not readvise Mr. Wardlow of that right and, instead, directed him where to initial.

After Mr. Wardlow came to and initialed next to that line, Detective Anderson continued, "Number four, if you agree to answer questions, you may stop at any time and request an attorney and no further questions will be asked of you. That is like one of the most important ones I want you to understand. We can start talking about why you're here today, but at any time you can tell me you want to stop and we'll stop." After noticing that Mr. Wardlow had dozed off again (his head tipped lower), Detective Anderson loudly stated, "Ron! Ron! Do you hear me?" For a second time during the actual advisement, Detective Anderson had to jostle Mr. Wardlow awake. He did not repeat the advisement.

Mr. Wardlow came to, and Detective Anderson continued down the *Miranda* rights. Finally, he said, "And then the next line says, I've been. I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with the police without having an attorney president. Present. You're willing to talk to me right now about what happened? . . . Ron?" For yet a third time during the advisement, Detective Anderson had to verbally poke

Mr. Wardlow to wake him up and get him to respond by signing the *Miranda* waiver form. Again, when Mr. Wardlow came to, Detective Anderson did not repeat the advisement.[1]

Acknowledging Mr. Wardlow's sluggishness, Detective Anderson finished the advisement and said, "Okay Ron. You seem. You keep dozing off. Is-is that because you're tired? Is that…is that because you're tired?" When Mr. Wardlow said yes, Detective Anderson said, "Because you said you weren't under the influence of anything?" Mr. Wardlow said he was tired.

Having gotten through the *Miranda* advisement with a dozing Mr. Wardlow, Detective Anderson interviewed Mr. Wardlow for approximately 45 minutes. Mr. Wardlow made incriminating statements during the remainder of the interview. After the interview was complete, Detective Anderson left the room and Mr. Wardlow went to sleep. He was awoken by officers roughly 45 minutes later and placed on his feet. While standing, he began to fall over. An officer grabbed Mr. Wardlow as he caught himself on the table:

 

---

[1] Undersigned counsel has requested the *Miranda* waiver form in discovery; it has not been produced.

The officer seated Mr. Wardlow until Detective Anderson reentered the room. Mr. Wardlow fell asleep again waiting for Detective Anderson. Upon his return to the room, Detective Anderson moved Mr. Wardlow's handcuffs while he continued to sleep:



Subsequently, Mr. Wardlow was charged in state court with offenses similar to those he now faces federally.

## **ARGUMENT**

I.   **Mr. Wardlow's Statements Made Prior To Being *Mirandized* Should Be Suppressed.**

The Fifth Amendment mandates "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court adopted prophylactic procedural measures to ensure that a person is advised of his Fifth Amendment rights during custodial interrogation. An individual is in custody "when, under the totality of the circumstances, 'a suspect's freedom from action is curtailed to a degree associated with formal arrest.'" *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). The operative question is whether, viewed objectively, "a reasonable person [would] have

felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citation and quotation omitted); *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007). A suspect is interrogated whenever he is "subjected to either express questioning or its functional equivalent," which includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

The essence of the "in custody" inquiry is whether the interrogation occurred in a "police-dominated atmosphere." *Miranda*, 384 U.S. at 445. Relevant factors to consider include: "the time, place and purpose of the encounter," "the words used by the officer," "the officer's tone of voice and general demeanor," "the presence of multiple officers," "the potential display of a weapon by an officer," "whether there was any physical contact between the officer and the defendant," "the suspect's isolation and separation from family," and "physical restrictions." *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (internal quotation marks omitted).

The inquiry considers not just what happened in the room where the interview occurred *but also* what the Fourth Circuit has called the "broader setting." *Id.* at 284. The Fourth Circuit has considered, for example, how the suspect was first encountered by law enforcement, the number of armed officers present, the "suspect and his family's loss of control over [a] home," and whether a suspect would have had to forfeit the opportunity to obtain the return of property by terminating the interview. *Id.* at 284-85; *Colonna*, 511 F.3d at 433, 436; *United States v. Giddins*, 858 F.3d 870, 880 (4th Cir. 2017).

Mr. Wardlow was "in custody" as soon as officers surrounded him, yelled with guns drawn, put hands on him, pulled him to the ground, and put handcuffs on him in the early morning hours of February 27, 2025. *E.g.*, *New York v. Quarles*, 467 U.S. 649, 655 (1984) (holding that a person

9

surrounded by four police officers and handcuffed "was in police custody"); *Hashime*, 734 F.3d at 283 (considering the time, words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the display of a weapon by an officer, physical contact between the officer and defendant, and physical restrictions in the custodial inquiry); *United States v. Fautz*, 812 F. Supp. 2d 570, 619-20 (D.N.J. 2011) (finding that a defendant was in custody because, while not handcuffed or physically touched, he was effectively prevented from moving by officers surrounding him and the premises was subject to law enforcement control); *United States v. Borostowski*, 775 F.3d 851, 860-63 (7th Cir. 2014) (similar). He was continually in custody after that moment. Throughout the early hours, he made statements in response to express and implied questions, as well as "words or actions on the part of the police" that they knew were "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 300-01. Yet, no officer read Mr. Wardlow his *Miranda* rights until 4:25 a.m., roughly two hours after he was first in custody. For these reasons, this Court should suppress any statements Mr. Wardlow made before he was *Mirandized* at the police station.

II.     **Mr. Wardlow's Statements After Being *Mirandized* Should Be Suppressed Because His Statements Were Not Voluntary Under The Due Process Clause And His *Miranda* Waiver Was Not Voluntary, Knowing, Or Intelligent.**

Mr. Wardlow seeks suppression of his statements after he was *Mirandized* for two separate reasons: first, under the Due Process Clause, his statements were not voluntary, and second, because his *Miranda* waiver was not voluntary, knowing, or intelligent.

A.     **Mr. Wardlow's Statements Were Not Voluntary Under The Due Process Clause.**

In ensuring that "'[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law," the Fifth Amendment requires statements to be "voluntary." *United States v. Braxton*, 112 F.3d 777, 780 (1997). The test for determining the

10

voluntariness of a statement under the Due Process Clause is "whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (internal quotation and citation removed)). The required inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). Courts consider the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*

Here, Mr. Wardlow's capacity for self-determination was critically impaired by his severe tiredness and intoxication and made him vulnerable to coercive police conduct. Mr. Wardlow was first encountered by officers and arrested around 2:15 a.m. At that point, he was smoking a joint filled with marijuana. He was transported to a police station and put in an interview room at 3:28 a.m. After Mr. Wardlow refused to answer questions at the outset of the interview, Detective Anderson intimidated him with all of the reasons why he would be found guilty, compelling him to talk and get out his side of the story:

> Detective Anderson: No? Do you have any idea why you are here?
>
> Mr. Wardlow: No.
>
> Detective Anderson: Alright . . . . You're here today in reference to an incident where a car was taken. Do you understand that?
>
> Mr. Wardlow: Yes.
>
> Detective Anderson: Do you want to talk about that?
>
> Mr. Wardlow: *[Shakes head, indicating no.]*
>
> Detective Anderson: No? You don't want to tell your side of the story about what happened?

Mr. Wardlow: I didn't take no car.

Detective Anderson: Ok well, this is your time to get in front of it. Alright . . . . The officers saw you with the car. You ran from the car. You hid and they found you. So, I mean, if you want to sit here and tell me I-I don't know anything about it, I don't know anything about it, there is video from when you took the car and there is video of you being with the car at the gas station getting gas. And then the police pull up and you run away. So I mean, this is, this is the best opportunity for you to tell us what happened. Your side of the story. You know, you're just trying to get home, you didn't mean to hurt anybody, whatever. . . . You know.

Mr. Wardlow: I was just trying to get home.

Detective Anderson: Before we get started with all that, I got to go over your advice of rights.

Detective Anderson was aware of Mr. Wardlow's impaired capacity – not knowing the answers to basic questions (the day of the week), being incomprehensible about money, mumbling, and nodding off many times – yet took advantage of it. During the *Miranda* advisement, Mr. Wardlow dozed off at multiple key moments (when being advised of his right to an attorney and his right to stop questioning). When Mr. Wardlow dozed off, Detective Anderson awakened him for the purpose of initialing the *Miranda* form but, importantly, did not readvise him of important rights he did not hear. Making matters worse, Detective Anderson simply directed Mr. Wardlow exactly where to sign on the form, pointing out where Mr. Wardlow needed to initial or sign. His impaired mental state further manifested itself in an inability to even stand on his feet at the end of the interview. Accordingly, Mr. Wardlow's statements were involuntary.

**B.      Mr. Wardlow's Statements Should Be Suppressed Because His Waiver Of His *Miranda* Rights Was Not Voluntary, Knowing, Or Intelligent.**

A person can "waive effectuation of [his Miranda] rights, provided the waiver is made voluntarily, knowingly, and intelligently." *United States v. Smith*, 608 F.2d 1011, 102 (4th Cir. 1979) (citing *Miranda*, 398 U.S. at 444). An "inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions." *United*

*States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002) (citing *Edwards v. Arizona*, 451 U.S. 477, 481 (1981)). *First*, the waiver must be voluntary: "the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* at 139 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). *Second*, the waiver must be knowing and intelligent: "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 140. In other words, even if the statements were voluntary, that is not sufficient; they must also be knowing and intelligently made. *Id.* at 142 ("Unlike the issue of voluntariness, police overreaching (coercion) is not a prerequisite for finding that a waiver was not knowing and intelligently made.").

The Court determines whether a *Miranda* waiver is voluntary, knowing, and intelligent by examining the totality of the circumstances. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421. In the context of intoxication, the Fourth Circuit has said that "the test of whether a person is too affected by alcohol or other drugs voluntarily and intelligently to waive his rights is one of coherence, of an understanding of what is happening." *Smith*, 608 F.2d at 1012. The government carries the burden of proving, by a preponderance of the evidence, that the defendant's waiver was voluntary, knowing, and intelligent. *United States v. Robinson*, 404 F.3d 850, 859 (4th Cir. 2005).

Here, the government cannot prove that Mr. Wardlow voluntarily, knowingly, and intelligently waived his *Miranda* rights due to a combination of intoxication and extreme fatigue that directly impacted the advisement—*i.e.*, resulted in Mr. Wardlow falling asleep during the advisement and missing key parts of it. In Part II.A., Mr. Wardlow focused on voluntariness. *See*

13

*Cristobal*, 293 F.3d at 140 ("We engage in the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause."). In this Part, Mr. Wardlow focuses on why his waiver was not knowing and intelligent.

Mr. Wardlow was first encountered by officers and arrested around 2:15 a.m. He was transported to a police station and put in an interview room at 3:28 a.m. Unsurprisingly, he promptly fell asleep. Around 3:40 a.m., Detective Anderson attempted to interview Mr. Wardlow. Detective Anderson immediately asked basic questions, clearly concerned that Mr. Wardlow was not coherent enough to be interviewed (*e.g.*, "Do you have any idea what day it is?"), and Mr. Wardlow could not answer all of the questions.

Just prior to *Mirandizing* Mr. Wardlow, Detective Anderson took cash from him and counted it. Mr. Wardlow was confused, needed to sit down, and dozed off numerous times. Detective Anderson was aware of that and checked in with Mr. Wardlow, telling him, "I need you to hang in there with me. Alright buddy?"

Still, Detective Anderson persisted. Detective Anderson asked who the President was, a question Mr. Wardlow answered correctly. Detective Anderson then asked whether Mr. Wardlow was under the influence of any drugs or alcohol. Mr. Wardlow responded yes. When Detective Anderson asked what he had used, Mr. Wardlow stared blankly ahead for approximately five seconds and changed his mind. That caused concern for Detective Anderson who asked another question to probe Mr. Wardlow's coherence, asking "Uhhh do you know what what day it is today?" When Mr. Wardlow responded, "I don't know," Detective Anderson switched to easier questions so he could continue the interview (the month and year).

Then Detective Anderson attempted to give Mr. Wardlow his *Miranda* advisement. Likely because he was not in a coherent place to read them himself, Mr. Wardlow asked Detective

14

Anderson to read them. And, as detailed above, then Mr. Wardlow nodded off *three separate times* and had to be woken up by Detective Anderson to initial the *Miranda* waiver form. Mr. Wardlow nodded off when Detective Anderson told him he had the right to talk to an attorney before any questioning or during any questioning *and* when Detective Anderson told him that if he agreed to answer questions, he could stop at any time and request an attorney and no further questions would be asked. And, finally, when Detective Anderson was summing up the form, advising Mr. Wardlow to sign on the form that he freely and voluntarily agreed to waive his rights and to talk with without an attorney present, he had to wake Mr. Wardlow up a final time. Though Detective Anderson noticed Mr. Wardlow sleep during these advisements, he did not repeat any of them before telling him to sign the waiver form. He continued to display physical impairments.

Under these circumstances, the government cannot even prove that Mr. Wardlow heard these important rights, much less that he voluntarily, knowingly, and intelligently waived them.

### <u>Conclusion</u>

For these reasons and any that become apparent at the upcoming motions hearing, Mr. Wardlow moves to suppress his statements.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

/s/_____

Summer Akhtar
Maggie Grace
Assistant Federal Public Defenders
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: 410-962-3962
Fax: 410-962-0872
Email: summer_akhtar@fd.org;

15

maggie_grace@fd.org

16